UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE CLARK, individually, and
KEVIN HARRINGTON, individually;

      Plaintiffs,

                            No.
-v-                         Hon.

ANTHONY ABDALLAH, in his
individual capacity; KEVIN SMITH, in his
individual capacity; and CITY OF
INKSTER, a Municipal corporation;
jointly and severally,

      Defendants.

---

## **COMPLAINT AND JURY DEMAND**

      NOW COME the Plaintiffs, GEORGE CLARK, individually, and KEVIN

HARRINGTON, individually, by and through their attorneys, MUELLER LAW

FIRM, by WOLFGANG MUELLER, and file their Complaint against the

Defendants, ANTHONY ABDALLAH, in his individual capacity, KEVIN

SMITH, in his individual capacity, and CITY OF INKSTER, a municipal

corporation, in this civil action, stating unto this Court as follows:

      1.    This is an action for damages brought pursuant to 42 U.S.C. §§1983

and 1998, the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United

States Constitution against Defendants, ANTHONY ABDALLAH

("ABDALLAH"), in his individual capacity; KEVIN SMITH ("SMITH"), in his individual capacity; and CITY OF INKSTER ("INKSTER"), a municipal corporation.

2.      Jurisdiction is founded upon 28 U.S.C. §1331.

3.      Venue is proper based on the situs of the incident, which occurred in the CITY OF INKSTER.  28 U.S.C. §1391.

## GENERAL ALLEGATIONS

4.      At all pertinent times Plaintiff, George Clark, was a United States citizen.

5.      At all pertinent times Plaintiff, Kevin Harrington, was a United States citizen.

6.      At all pertinent times Defendant, ABDALLAH, was employed as a Sergeant by the INKSTER Police Department ("IPD"), a department of Defendant, INKSTER, and was acting within the scope of his employment and under color of law.

7.      At all pertinent times Defendant, SMITH, was employed as a Sergeant by the INKSTER Police Department ("IPD"), a department of Defendant, INKSTER, and was acting within the scope of his employment and under color of law.

8.      ABDALLAH and SMITH, as sworn police officers, had taken an

2

oath, the Law Enforcement Code of Ethics, that stated in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

9.     Defendant, INKSTER, at all relevant times, was a municipal corporation organized under the laws of the State of Michigan.

## **GENERAL ALLEGATIONS**

10.     At approximately 11:00 a.m., on September 27, 2002, a boy passing out church fliers discovered the body of Inkster resident Michael Martin at the edge of a wooded area near Henry Ruff Rd., south of Michigan Ave., in Inkster.

11.     The boy flagged down a woman, Bearia Stewart, who was getting into her car.  He informed Ms. Stewart of his discovery.  Ms. Stewart then called 911.

12.     Detectives from the Inkster Police department, including Officer-in-Charge, ANTHONY ABDALLAH, responded to the scene and began to investigate.

13.     Inkster detective Paul Martin interviewed Ms. Stewart, who told him she saw the victim with a man named "Man-Pie" between noon and 3:00 p.m., the previous day.

14.     Ms. Stewart, despite not being involved in any way in the crime, was

3

taken to the Inkster Police department where she was read her constitutional rights and interrogated for over five hours by Defendants, ABDALLAH and SMITH. She was not allowed to leave.

15.    Ms. Stewart advised ABDALLAH and SMITH that she suffered from mental illness and could not read or write.

16.    During the course of the interrogation, ABDALLAH and SMITH repeatedly threatened to have Stewart arrested for lying to them because she denied knowing anything about the crime a minimum of 23 times.  ABDALLAH further threatened to call Social Services to take away her two young children because she was going to be arrested.

17.    ABDALLAH repeatedly told Ms. Stewart he could tell from her body language that she was scared and suggested to her that Man-pie had already threatened her.

18.    ABDALLAH apparently learned the body language interpretation from the debunked, infamous Reid Technique of Interviewing and Interrogation.

19.    ABDALLAH would later admit he could not tell from his Reid Technique training if Ms. Stewart's body language suggested she was scared or simply lying.

20.    In the face of these intimidation and coercion tactics, Stewart, who feared losing custody of her two children, made up a story about having witnessed

4

events at approximately 11:00 to 11:30 p.m., the prior evening.

21.     Stewart's story included Plaintiffs beating up Michael Martin, then dragging him to the woods where they presumably shot him to death.  Clark and Harrington then purportedly came back to Stewart's house and threatened to kill her if she told anyone what she witnessed.

22.     Neither ABDALLAH nor SMITH intervened while watching the other threaten and coerce Stewart into fabricating a story implicating Plaintiffs in Michael Martin's murder.

23.     The content of Stewart's fabricated story, the direct result of ABDALLAH and SMITH putting the proverbial gun to her head, became the <u>sole basis</u> for probable cause for Plaintiffs' arrests and continued detention, as there was <u>no other evidence</u> linking them to the crime.  Plaintiffs were bound over for trial based on Stewart's fabricated testimony at the Preliminary Exam and ABDALLAH's false statements under oath.

24.     ABDALLAH and SMITH deliberately chose not to tell the prosecutor that Stewart's story was made up and a product of ABDALLAH and SMITH'S threats and coercion.

25.     ABDALLAH deliberately chose not to disclose in his Investigator's Report that there was a cassette and videotape made that included his threats to have Ms. Stewart arrested and lose custody of her children.

26.     Clark was seized at his house on September 28, 2002.  He was taken to the Inkster Police department where he was interrogated by ABDALLAH.

27.     ABDALLAH told Clark he knew Clark did not commit the murder but that Clark knew who was the perpetrator.  When Clark told ABDALLAH that he didn't know anything and wasn't going to do ABDALLAH's job, ABDALLAH told Plaintiff, *"Then I'm going to say it was you and you killed him over drug money."*

28.     On September 30, Tyronda Moore went to the IPD and spoke to ABDALLAH.  She told the detective that they had arrested the wrong person because she was with George Clark throughout the night of September 26-27.

29.     ABDALLAH accused Moore of lying and had her arrested without probable cause and put into jail for 2-3 days without ever charging her with a crime.  He told her she *"needed to change her story."*

30.     ABDALLAH submitted his Investigator's Report/Warrant Request to the Prosecutor's Office on or after September 30, 2002.  His investigator's report included, at a minimum, the following false statements or omissions of material facts to manufacture probable cause:

- That Ms. Stewart stated Man-Pie and K-Dog (nicknames for George Clark and Kevin Harrington, respectively), beat up and killed Michael Martin.  ABDALLAH did not include that Ms. Stewart repeatedly said she knew nothing about the crime and that she made up the story only after being threatened with arrest and Social Services taking her children

away from her.

- That the last time Ms. Stewart saw Clark with the victim was between noon and 3:00 p.m., on September 26, the day before the murder.

- ABDALLAH chose not to disclose that Ms. Stewart advised him that she suffered from "mental illness."

31. But for Ms. Stewart's fabricated statement, the result of ABDALLAH and SMITH's threats and coercion, there would have been no probable cause for Plaintiffs' arrests.

32. The warrant prosecutor did no independent investigation into the case and, instead, relied on the false statements contained within the Investigator's Report.

33. On October 2, 2002, the warrant prosecutor recommended criminal charges be filed against Plaintiffs for the murder of Michael Martin.

34. ABDALLAH swore to facts in support of the warrant, which was signed by Judge Sylvia James on October 3, 2002.

35. Clark was arraigned on October 3, 2002.

36. Harrington was arrested on October 19, 2002, in Ann Arbor as he stepped off a bus from Albuquerque, New Mexico, where he had been visiting a friend since August.

37. ABDALLAH knowingly and deliberately made false statements and omitted material facts which he and any reasonable officer would know that a

magistrate judge would want to know before approving arrest warrants for murder.

38.    ABDALLAH knew that probable cause was lacking for the arrest, as he and SMITH threatened and coerced Bearia Stewart into making up a fabricated statement implicating Plaintiffs in the murder.

39.    ABDALLAH knew that absent Ms. Stewart's fabricated statement, probable cause was lacking for Plaintiffs' arrest because there was no evidence linking them to Michael Martin's murder.

40.    ABDALLAH knew that there was no physical evidence or eyewitness evidence linking Plaintiffs to the murder.

41.    Within days of the murder and following word that George Clark had been arrested, Kameka Jackson told her father, Gregory Hill, a Lieutenant for the Inkster Police Department, that she had witnessed a *"6 foot 1 black, dark skinned male"* man walking toward the woods with Michael Martin with a handgun in Martin's back.  Shortly thereafter, she heard several gunshots and saw the same man run past her without Michael Martin.

42.    Jackson told Hill that she knew George Clark and that Clark was not the man she saw with Martin immediately before the murder.

43.    Hill told Jackson to keep quiet and not to say anything to anyone for her own safety and that he would "take care of it."

44.    Hill was part of the Command Staff of the IPD and was aware of the

investigation into the Martin murder.  He was also aware that George Clark had been arrested.

45.     Hill, in accordance with chain of command for criminal investigations in a paramilitary organization like the IPD, told the OIC, ABDALLAH, what Jackson told him.

46.     Neither Hill nor ABDALLAH wrote a memo or report about the exculpatory evidence and neither man told a prosecutor about the evidence at any time before Clark and Harrington were convicted by a jury on February 11, 2003.

47.     The evidence from Kameka Jackson was exculpatory evidence as to both Plaintiffs and was impeachment evidence as to the fabricated story being told by Bearia Stewart.  It would have been apparent *Brady/Giglio* evidence to any reasonably trained officer.

48.     The Preliminary Exam for George Clark took place on October 23, 2002.  Kevin Harrington's Preliminary Exam took place on October 30, 2002. Bearia Stewart testified at both hearings and was the sole witness to establish probable cause in each hearing.

49.     Ms. Stewart, afraid of the police and coerced by ABDALLAH'S and SMITH's threats and illegal tactics, testified at Plaintiffs' Preliminary Examination that Michael Martin was on his back porch at his unit, approximately five doors down from Ms. Stewart in the Parkside complex, when Clark, whom she knew as

"Man-pie," drove up in a vehicle with another man she knew as "K-Dog."

50.    Ms. Stewart testified that Clark and Martin were arguing about money Martin owed Clark for drugs.  The two men began fighting.  Clark then went back to the car and he and "K-Dog" returned to Martin's apartment where they both began beating on Mr. Martin.  They dragged Mr. Martin into a nearby field and Ms. Stewart retreated into her apartment.  As she was entering her apartment, she heard three or four gunshots coming from the field where Man-Pie and K-Dog had allegedly dragged Martin.

51.    Ms. Stewart further testified that Man-Pie and K-Dog returned to her apartment and knocked on her door.  K-Dog threatened that if Ms. Stewart told anyone what she saw they would kill her.  She also testified that K-Dog had a gun with him when the two men knocked on her apartment door.

52.    Based on Stewart's fabricated testimony and ABDALLAH's false statements, Plaintiffs' cases were bound over to Circuit Court for trial.

53.    Plaintiffs' murder trial began on January 29, 2003.

54.    At trial, Ms. Stewart claimed not to remember anything.  The trial court deemed Ms. Stewart "unavailable" and allowed her Preliminary Exam transcript to be read to the jury.

55.    ABDALLAH knew that Stewart's testimony was false because he and SMITH manufactured it with their threats and coercive tactics.

10

56.     ABDALLAH, sitting at counsel's table with the prosecutor, made no effort to correct the false testimony.

57.     Bearia Stewart's testimony was the centerpiece of the State's case, since she was the only witness to place Plaintiffs at the scene of the murder with Michael Martin and there was no other evidence implicating either Plaintiff.  The prosecutor stressed Stewart's testimony in his opening statement and closing argument.

58.     During the course of the case and before trial, Ms. Tammy Wiseman, a friend of Bearia Stewart, was arrested for retail fraud in the City of Taylor.  It was approximately her 13th such arrest.

59.     ABDALLAH was contacted by the Taylor Police Department and promised to help Ms. Wiseman with her criminal case in Taylor.

60.     ABDALLAH convinced Ms. Wiseman to write a report and later testify at trial that Plaintiff's lawyer and the lawyer for co-defendant, Kevin Harrington, asked her to lie at trial and testify that she was with Bearia Stewart at Ms. Wiseman's house on the night of the murder and that Ms. Stewart could not, and did not, witness anything having to do with the murder.

61.     Ms. Wiseman also testified that she was asked by the Defendants' lawyers to testify that Ms. Stewart told her Stewart was promised money, housing, and protection by the Inkster Police detectives for her testimony.

11

62.     Following her written statement, Ms. Wiseman was driven home by an Inkster police officer instead of being driven back to the Taylor Police Department.

63.     Ms. Wiseman's fabricated statement and testimony given to the Wayne County Prosecutor's Office, as well as her testimony at trial, was the result of promises made by ABDALLAH to help secure Plaintiffs' convictions.

64.     ABDALLAH did not tell the prosecutor that he secured the false testimony by promising Ms. Wiseman help with her criminal case in Taylor.

65.     ABDALLAH knew that testimony accusing Plaintiffs and their lawyers of attempting to suborn perjury would be devastating to the chances of an acquittal.

66.     On February 11, 2003, a Wayne County Circuit Court jury convicted Plaintiffs of the first-degree murder of Michael Martin.

67.     On February 25, 2003, George Clark was given a life sentence without the possibility of parole.

68.     On March 25, 2003, Kevin Harrington was given a life sentence without the possibility of parole.

69.     Based on Ms. Stewart's testimony in Kevin Harrington's fourth trial[1],

---

[1]   Kevin Harrington's conviction in his first trial was vacated due to attorney misconduct.  Ms. Stewart recanted her previous testimony in Harrington's

12

on January 20, 2006, a Wayne County Circuit Court jury convicted Harrington of the first-degree murder of Michael Martin.

70.     On February 15, 2006, Kevin Harrington was given a life sentence without the possibility of parole.  *Id*.  He had already spent almost three-and-one-half years wrongfully imprisoned by the time of his conviction and sentencing in the fourth trial.

71.     There was no physical evidence linking Plaintiffs to the murder.

72.     There was no forensic evidence linking Plaintiffs to the murder.

73.     There were no confessions.

74.     There was only the testimony of the alleged eyewitness, Ms. Stewart, whose testimony was fabricated because of the threats and coercion from ABDALLAH and SMITH.

## POST-TRIAL DEVELOPMENTS

75.     Ms. Stewart has since recanted her testimony provided in *People v. George Clark*, Case. No. 02-013661, and *People v. Kevin Harrington*, Case No. 02-013495.

76.     Ms. Stewart has sworn, via affidavit on May 4, 2003, that she was coerced and threatened by Inkster Detectives ABDALLAH and SMITH into

---

subsequent trials.  His second and third trials resulted in hung juries and mistrials. He was finally convicted in his fourth trial.

implicating Plaintiff and Harrington. *"Before my taped interview, Officers Abdallah and Smith had threatened me with keeping me in custody over the weekend, sending me to jail and taking my children away from me …. I had been so intimidated by the two police officers that I made up the story I provided to them."* (Stewart affidavit, 05-04-03, ¶¶ 7-8).

77.    Ms. Stewart has further stated under oath: *"I had not been truthful with the Third Circuit Court judge or the jury when [I made] false and misleading statements and omissions upon the Circuit Court record which was used to convict both Mr. Kevin Harrington and George Clark, because I had been so intimidated by Officer Abdallah and Smith's actions towards me that I made up the story I provided to them.  I tried to come clean but they told me if I changed my story, I'd be trading places with Mr. Harrington and Mr. Clark."* (Stewart affidavit, 03-18-13, ¶ 5).

78.    Ms. Stewart further swore: *"This act was committed out of fear because I was told that if I did not help them put both Mr. Clark and Mr. Harrington away, they would lock me up and tie me in with the murder of Michael Martin as an accomplice right along side Mr. Clark and Mr. Harrington.  They also promised they would start the process to take away my children, place them in foster care and make sure I lose all my parental rights . . . ."* (Stewart affidavit, 03-18-13, ¶ 8).

14

79.     Ms. Stewart was the only witness who linked Plaintiff to Mr. Martin's murder.

80.     Following years of unsuccessful appeals, George Clark was able to successfully petition for a writ of habeas corpus after discovering a witness, Kaneka Jackson, who provided an affidavit stating that on the night of the murder, she was taking out her mother's trash at the Parkside apartments when she saw Mr. Martin struggling with a 6'1" dark-skinned black male with a silver handgun.  The unknown black male was taking Mr. Martin into the woods near the apartments. As Ms. Jackson returned to her mother's apartment, she heard three gunshots coming from the woods.  She testified consistent with her affidavit at a bond hearing in federal court on February 20, 2019.

81.     Newly-discovered evidence from Clark and Harrington's lawyers and the Wayne County Prosecutor's Office Conviction Integrity Unit ("CIU") investigation that was not presented at Plaintiffs' trials included Ms. Jackson's evidence.  This evidence was never provided to the Assistant Prosecuting attorney or defense counsel, in violation of *Brady v Maryland*.

82.     As a result of the newly-discovered evidence, the CIU submitted the case to Wayne County Prosecutor, Kym Worthy.  Prosecutor Worthy agreed to vacate Clark's conviction and dismiss criminal charges.

83.     On April 9, 2020, George Clark was released from prison on bond

pending a decision by the Wayne County Prosecutor to dismiss the criminal charges against him.

84. George Clark's criminal case was dismissed on April 21, 2020.

85. As a result of the newly-discovered evidence uncovered by the University of Michigan Innocence Clinic, the CIU submitted Kevin Harrington's case to Wayne County Prosecutor, Kym Worthy. Prosecutor Worthy agreed to vacate the conviction and dismiss criminal charges.

86. On April 21, 2020, Kevin Harrington was released from prison.

87. From the date of George Clark's arrest, on or about October 3, 2002, to the dismissal of criminal charges on April 21, 2020, George Clark spent **6,411 days** illegally detained or imprisoned, **a total of 17 years, 6 months, and 19 days**.

88. From the date of Kevin Harrington's arrest, on or about October 20, 2002, to the dismissal of criminal charges on April 21, 2020, Kevin Harrington spent **6,394 days** illegally detained or imprisoned, **a total of 17 years, 6 months, and 2 days**.

### **INKSTER'S POLICIES, CUSTOMS AND LACK OF TRAINING**

89. Prior to the date of Plaintiffs' respective convictions, no IPD officers or detectives had any training in the proper handling and reporting of exculpatory and/or impeachment evidence, or the requirement of candor and honesty when submitting reports to prosecutors or magistrates in support of warrants or when

16

testifying in support of a probable cause finding.

90.     On and before September 26, 2002, INKSTER, by and through its final policymakers, had a custom to authorize, condone, tolerate and approve illegal and unconstitutional actions by INKSTER Police Department officers and command staff.

91.     The illegal and unconstitutional actions and practices included but were not limited to:

a.     Knowingly and deliberately fabricating evidence in interrogations to manufacture probable cause to support an arrest and conviction;

b.     Knowingly ratifying and not disciplining detectives who had previously been found to have fabricated evidence or made false statements and/or material omissions to support a search or arrest warrant; and

c.     Failing to train officers in the proper methods of obtaining evidence and being candid and honest in search warrant affidavits and testimony before judges in hearings to determine probable cause, and the handling of exculpatory evidence, all of which were standard, everyday functions for officers in the IPD; and,

d.     Other acts that will become evident during discovery.

92.     INKSTER's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Plaintiffs.

93.     The policies, customs, and practices of Defendant, INKSTER; i.e.,

"*Monell*" violations, set forth herein, were the moving force behind the individual Defendants' constitutional violations.

94.     INKSTER's *Monell* violations were a direct and proximate cause of Plaintiffs' injuries and damages, as they caused the individual defendants to think they could act with impunity, given the unwritten policy and custom of tolerance for fabrication of evidence, lies, half-truths, deliberate or reckless omissions of material facts supporting arrest warrant affidavits to manufacture probable cause for an arrest, and deliberate concealment of material "*Brady/Giglio*" evidence from the prosecutor.

95.     The individual defendants' misconduct, and the policies and customs of INKSTER, as set forth below, were a direct and proximate cause of Plaintiffs' injuries and damages, including:

   a.     Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over seventeen and one-half years;

   b.     Severe emotional distress for the period from their arrest to the present, including, but not limited to: the emotional distress of being charged with murder, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew they did not commit;

   c.     Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

18

d.     Fright, shock, indignity, humiliation, outrage, and
       embarrassment of being wrongfully charged and
       imprisoned for murder;

e.     Loss of enjoyment of daily activities;

f.     Not being able to attend the funerals of several family
       members and loss of relationships;

g.     Physical injuries suffered in prison;

h.     Loss of employment and educational opportunity, past
       income, and future earning capacity;

i.     Restricted and/or complete loss of all forms of personal
       freedom and physical liberty, including but not limited to
       diet, sleep, personal contact, educational opportunity,
       vocational opportunity, personal fulfillment, sexual
       activity, family relations, recreational activities, and
       personal expression;

j.     Many of Plaintiffs' injuries and damages are likely to be
       permanent;

k.     Other damages which may be revealed through
       discovery.

## COUNT I
## 4th AND 14th AMENDMENT "FABRICATION
## OF EVIDENCE" BY DEFENDANTS ABDALLAH AND SMITH

96.    Plaintiffs incorporate by reference each preceding paragraph as if

fully stated herein.

97.    At all times, Plaintiffs had a constitutional right, secured by the 4th and

14th Amendments, not to be seized and deprived of liberty as a result of fabrication

19

of evidence by a government officer acting in an investigative capacity.  *See Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019) ("[F]abricated evidence that 'is used as the basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury.") (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n. 19 (3d Cir. 2014)).

98.     Plaintiffs' constitutional right to be free from arrest and prosecution based upon fabrication of evidence by a police officer acting in a governmental capacity to manufacture probable cause for an arrest was clearly established before September 27, 2002, the earliest possible date of police misconduct.  *Jackson*, 925 F.3d at 825 (6th Cir. 2019) (fabrication of evidence claim clearly established in 1975).

99.     ABDALLAH and SMITH deliberately and knowingly fabricated evidence to manufacture probable cause for an arrest warrant and to later secure Plaintiffs' convictions.  Their fabrication included threatening and coercing Bearia Stewart into falsely implicating Plaintiffs to avoid losing custody of her children, and illegally arresting, jailing, threatening Tyronda Moore so she would not appear at trial as an alibi witness for George Clark and, by extension, Kevin Harrington, and fabricating Tammy Wiseman's testimony.

## COUNT II
## 4TH AND 14th AMENDMENT MALICIOUS
## PROSECUTION BY DEFENDANTS ABDALLAH AND SMITH

100.    Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

101.    At all times, Plaintiffs had a constitutional right, secured by the 4th and 14th Amendments, not to be seized and deprived of liberty as a result of fabrication of evidence and knowingly or recklessly-made false statements or material omissions by a police officer in order to manufacture probable cause.

102.    Defendants, ABDALLAH and SMITH, influenced or participated in the initiation of criminal prosecution and continued detention when they deliberately and knowingly fabricated evidence in the interrogation of Bearia Stewart, which was material to a finding of probable cause and Plaintiffs' ultimate convictions.

103.    But for Defendants' fabrication of evidence and deliberate false statements and material omissions in his police reports, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment.  *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person."). *See also Franks v. Delaware*, 438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d

667 (1978).

104.   Plaintiffs' cause of action for federal malicious prosecution became complete when criminal charges were dismissed on April 21, 2020.

105.   Plaintiffs' constitutional right to be free from illegal seizure and continued detention without probable cause based upon fabrication of evidence and false statements or material omissions by a government officer acting in an investigative capacity in order to manufacture probable cause was clearly established before September 27, 2002, the earliest possible date for police msiconduct.  *See Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).

### COUNT III
### *"BRADY"* VIOLATIONS BY DEFENDANT ABDALLAH

106.   Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

107.   At all times, Plaintiffs had constitutional right of due process, guaranteed by the 5th and 14th Amendments, and the right to a fair trial under the 6th Amendment, to be free from police officers not disclosing to the prosecutor material exculpatory and/or impeachment *("Brady/Giglio")* evidence.

108.      Defendant, ABDALLAH, knowingly violated his unwavering legal duty (*"Brady"* duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, by failing to tell the prosecutor

the following:

a.  The fact that he and Smith had illegally jailed and threatened Tyronda Moore to make sure she did not testify as an alibi witness for George Clark;

b.  The fact that Det. Hill had relayed information from his stepdaughter, Kaneka Jackson, that she had seen the shooter and George Clark was not involved in the murder;

c.  The fact that he fabricated Tammy Wiseman's testimony by helping her with her criminal case in the City of Taylor and not disclosing the fabrication;

d.  Other exculpatory and impeachment evidence that will be revealed during discovery.

109.  ABDALLAH's deliberate and knowing failure to disclose the above-referenced evidence to the prosecutor resulted in material exculpatory and impeachment evidence not being turned over to Plaintiffs' defense counsel, in violation of the State's *Brady* obligations.

110.  ABDALLAH's *Brady* violations resulted in Plaintiffs not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, (1995).  Had ABDALLAH disclosed the *Brady* evidence, there would have been no arrest, much less a conviction.  A re-trial that included the *Brady* evidence would result in a directed verdict or acquittal.

111.  The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

112.  Plaintiffs' right to be provided with material exculpatory and

impeachment evidence ("*Brady*" evidence), was clearly established before September 27, 2002, the earliest possible date for ABDALLAH's misconduct. *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.").

**COUNT IV**
**DEFENDANT, CITY OF INKSTER'S, "*MONELL*" LIABILITY**

113.   Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

114.   Defendant, INKSTER, created policies, practices and customs, as set forth above, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiffs' constitutional rights.

115.   As a direct and proximate result of the individual Defendants' willful violation of Plaintiffs' constitutionally-protected rights, George Clark and Kevin Harrington were seized without probable cause, charged with crimes they did not commit, wrongfully convicted and deprived of their liberty, causing them to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff, GEORGE CLARK, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

24

a. Past and future compensatory damages against all defendants in a minimum amount of Forty Million Dollars (**$40,000,000.00**);

b. Punitive damages as to Defendant, ABDALLAH, in a minimum amount of Twenty Million Dollars (**$20,000,000.00);**

c. Punitive damages as to Defendant, SMITH, in a minimum amount of Twenty Million Dollars (**$20,000,000.00);**

d. Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

e. The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

f. Such other and further relief as appears just and proper.

WHEREFORE, Plaintiff, KEVIN HARRINGTON, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a. Past and future compensatory damages against all defendants in a minimum amount of Forty Million Dollars (**$40,000,000.00**);

b. Punitive damages as to Defendant, ABDALLAH, in a minimum amount of Twenty Million Dollars (**$20,000,000.00);**

c. Punitive damages as to Defendant, SMITH, in a minimum amount of Twenty Million Dollars (**$20,000,000.00);**

d. Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

e. The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

f. Such other and further relief as appears just and proper.

Respectfully submitted,

MUELLER LAW FIRM


*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  January 4, 2021


## JURY DEMAND

Plaintiffs demand a jury trial in the above-captioned matter.


Respectfully submitted,

MUELLER LAW FIRM


*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  January 4, 2021