UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE CLARK, et al.,

     Plaintiff,

v.

Case No. 21-10001
Honorable Victoria A. Roberts
Magistrate Elizabeth A. Stafford

ANTHONY
ABDALLAH, et al.,

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART ABDALLAH AND SMITH'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 138]

### I.    INTRODUCTION

This case is a tale of alleged police misconduct, egregious lies, witness tampering, and elaborate facts worthy of a movie script.

George Clark and Kevin Harrington ("Plaintiffs") sue the City of Inkster and police officers Anthony Abdallah, Kevin Smith, and John Hermann (as personal representative for the Estate of Gregory Hill) under 42 U.S.C. § 1983 for alleged acts of police misconduct. Plaintiffs say these acts resulted in their wrongful convictions for murder.

Against the individual officers, Plaintiffs allege fabrication of evidence, federal and state malicious prosecution, and *Brady* violations.

1

Before the Court is Abdallah and Smith's ("Defendants") motion for summary judgment. For the reasons below, the Court **GRANTS** the motion in part and **DENIES** it in part.

## II.   FACTUAL BACKGROUND

At approximately 11:00 a.m. on September 27, 2002, a boy passing out church fliers discovered the body of Michael Martin at the edge of a wooded area in Inkster, Michigan. The boy flagged down a woman, Bearia Stewart, as she got in her car. He informed Stewart of his discovery. Stewart called 911. Detectives from the Inkster Police Department, including the Officer-in-Charge, Anthony Abdallah, responded to the scene and began to investigate. Inkster Detective Paul Martin interviewed Stewart. She told him she saw the victim with a man named "Man-Pie" between noon and 3:00 p.m. the day before.

Officers took Stewart to the Inkster Police Department. They read Stewart her constitutional rights. Abdallah and Smith interrogated her for over five hours.

### Facts Surrounding Bearia Stewart

During the interrogation, Stewart advised Abdallah and Smith that she suffered from mental illness and could not read or write. The transcript and audio tape of the interrogation indicates that Stewart told

2

the detectives at least 26 times that she did not know what happened, see what happened, or hear what happened on the night of the murder. Abdallah threatened her, saying things like "we're going to call Social Services and have your kids picked up because you're going to be locked up, okay?" [ECF No. 153, PageID.4841].

Faced with the threat of jail and the loss of her children, Stewart's story started to evolve. She told Defendants various (and inconsistent) stories about witnessing Clark and Harrington murder Martin. For example, at one point, she said the murder occurred at 11 a.m., and at another, she said it occurred at 11 p.m. The officers said to Stewart, "if we have to sit here until two o'clock tomorrow morning, that's what we're going to do, okay." *Id.* at PageID.4842.

After changing her story multiple times and following a questionable 40-minute break in her interview recording that is unaccounted for, Stewart finally came back on the record with a consistent story. She told Defendants that around 11-11:30pm on September 26, 2002, she was in her apartment and observed Clark pull up in a gray car and argue with Martin over drugs. She said that Clark then went back to the car, Harrington got out, and the two men beat Martin in the face and body. Stewart said that the men then dragged Martin to the woods, and she

3

heard gunshots. She told the officers that Clark and Harrington came back to her apartment, banged on her door, and threatened to kill her and her children if she told anyone what she saw. Stewart's witness statement was recorded on video.

Defendants arrested Plaintiffs. Stewart's story became the sole basis for probable cause. No other evidence linked them to the crime. Clark's preliminary examination (in which a court determined that there was probable cause for his detention) took place on October 23, 2002. Harrington's took place on October 30, 2002. As the only witness at each hearing, Stewart was essential to the determination of probable cause. At the hearings, Stewart testified under oath consistent with the video statement Defendants recorded the day after Martin's murder.

The murder trial began on January 29, 2003, in state court. Stewart took the stand but refused to answer questions. The trial judge declared her unavailable and allowed her preliminary exam testimony to be read to the jury. On February 11, 2003, the jury convicted Plaintiffs of the first-degree murder of Michael Martin. The court sentenced both men to life in prison without the possibility of parole.

After the trial, the court granted Harrington a new trial based on attorney misconduct. Clark's conviction remained intact. Harrington's

second and third trials resulted in hung juries. In these trials, Stewart recanted her preliminary exam testimony; she testified that she did not see the murder take place, and that she only said she did at the preliminary examination hearings because the police forced her. She testified that she was afraid of the police because they cursed her out, threatened to take her kids, and put her in jail.

The state finally obtained Harrington's second guilty verdict at his fourth trial on January 20, 2006. Though Stewart testified consistent with her recantations, she was impeached with her preliminary exam testimony. A state court again sentenced Harrington to life without the possibility of parole.

### Facts Surrounding Tyrhonda Moore

On September 30, 2002, Tyrhonda Moore went to the Inkster Police Department with information about George Clark for Michael Martin's murder. Moore told Abdallah that he had arrested the wrong person, because on September 26 she spent the entire evening with Clark until 3:30-4:00am the following morning. (Bearia Stewart testified that the murder occurred between 11-11:30 p.m. on September 26.) Moore told Abdallah that she received a call from Clark the next morning; he said Martin had been "smoked."

5

In her deposition, Moore says that Abdallah accused her of lying, held her in jail for two to three days without charging her with a crime, threatened to arrest her, and said she needed to change her story. She did not. Shortly after Abdallah released her, Moore says she moved to Tennessee because she was afraid of the police. Abdallah did not disclose to Plaintiffs' defense counsel that he had illegally jailed Moore and threatened her to change her story.

### Facts Surrounding Kaneka Jackson

Within days of Martin's murder and following word that Defendants arrested Clark, Kaneka Jackson told her father, Gregory Hill, a Lieutenant for the Inkster Police Department, that she had witnessed a "6-foot-1 black, dark-skinned male" walking toward the woods with Michael Martin with a handgun in Martin's back. [ECF No. 153, PageID.4844]. Soon, she heard gunshots and saw the same man run past her without Michael Martin.

Jackson told Hill that she knew George Clark and that Clark was not the man she saw with Martin immediately before the murder. Hill allegedly told Jackson to keep quiet and not to say anything to anyone for her own safety and that he would "take care of it."

Jackson says that Hill told her that he told "the investigating officers"

6

what she said. Hill did not specify who the "investigating officers" were. Plaintiffs provide no evidence to support that Abdallah and Smith knew of Jackson's witness account, and Abdallah denied knowing about Jackson's evidence.

Neither Hill nor Abdallah wrote a memorandum or report about the exculpatory evidence, and neither of them told defense counsel about the Jackson evidence at any time before a jury convicted Clark and Harrington of murder.

### **Facts Surrounding Tammy Wiseman**

A day before Plaintiffs' first trial was to begin, officers arrested Tammy Wiseman, a friend of Bearia Stewart, for retail fraud in Taylor, Michigan. When the Taylor police department found a subpoena in her purse ordering her to appear to testify at Plaintiffs' trial, they contacted Abdallah.

Wiseman testified at her deposition that after meeting Abdallah at the Taylor police station, she told him she was with Stewart the night of Martin's murder. In response, Abdallah told her "over and over and over" that she was lying, [ECF No. 138-20, PageID.4376], and threatened to take her children away and lock her up unless she told him what he wanted to hear: that Plaintiffs threatened her into saying that she was with Bearia Stewart the night of the murder when she really was not.

Wiseman wrote a report and testified at Plaintiffs' joint trial that Plaintiffs' lawyers asked her to lie for them on the stand. Wiseman also testified that after Plaintiffs found out she was going to testify for the defense, she received threatening phone calls and a letter telling her that she better not show up in court for her own safety and the safety of her children.

In Harrington's subsequent trials, Wiseman recanted. She testified Abdallah coerced her to lie on the stand and say Plaintiffs threatened her in the first trial. In her recantations, Wiseman testified (and maintains today) that she actually *was* with Stewart on the night of the murder (what she originally told Abdallah), but that she lied on the stand in Plaintiffs' first trial because she: 1) was scared of the Inkster Police Department; 2) did not want the police to take away her kids as they threatened to do; 3) was going through drug withdrawal during the interview; and 4) just wanted to go home.

Wiseman also says that in exchange for her false statements, Abdallah helped her with her retail fraud case by getting her released from jail without payment of bond. She testified in her deposition that she was willing to tell Abdallah "whatever he wanted to hear" so she could go home. However, Wiseman also testified that Abdallah did not tell her what to say, nor did he force her to say anything.

Abdallah did not disclose to Plaintiffs' defense team that he had

secured allegedly false testimony by promising to help Wiseman with her criminal case, or that the false testimony was the product of threats and coercion.

### Post-Conviction Relief

After years of unsuccessful appeals, Clark successfully petitioned for a writ of habeas corpus after he discovered the Kaneka Jackson evidence. This Court found that the failure to turn over the Jackson evidence violated *Brady v. Maryland*, 373 U.S. 83 (1963).

With this newly discovered evidence, the Wayne County Prosecution Conviction Integrity Unit investigated Plaintiffs' criminal case. Following that investigation, the state agreed to vacate their convictions and dismiss criminal charges. When charges were dismissed on April 21, 2020, both men had spent 17 and a half years in prison for a crime they allegedly did not commit.

### III.   LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

The movant bears the initial burden to inform the Court of the basis for the motion and must identify portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-moving party must set forth specific facts showing a genuine issue for trial. *Id*. at 324.

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Claims that are not supported by admissible evidence are insufficient to establish a factual dispute, as is the mere existence of a scintilla of evidence in support of the non-movant's position*. Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

The Court must view all submitted evidence, facts, and reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970). The district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994). The necessary inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

10

that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d

343, 346 (6th Cir. 1993) (internal quotes omitted).

## IV.   ANALYSIS

Defendants contend they are entitled to qualified immunity on all of

Plaintiffs' claims. They also assert that the testimony of Bearia Stewart, the

star witness, is inadmissible hearsay. The Court addresses qualified

immunity before turning to the hearsay issue.

### A) Qualified Immunity

Under qualified immunity, police officers are not subject to damages

liability for the performance of discretionary functions if their conduct does

not violate clearly established statutory or constitutional rights of which a

reasonable person would have known. *Buckley v. Fitzsimmons*, 509 U.S.

259, 268 (1993). Most public officials are entitled to qualified immunity.

*Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *Butz v. Economou*, 438 U.S.

478, 508 (1978).

Courts make two inquiries when resolving qualified immunity claims:

(1) whether the facts, viewed in the light most favorable to the plaintiff, show

a violation of a constitutional right, and (2) whether the right or law at issue

was 'clearly established' at the time of the defendant's alleged misconduct.

11

*Middaugh v. City of Three Rivers*, 684 F. App'x 522, 526 (6th Cir. 2017) (internal quotes omitted). Both conditions must be met for a suit against the official to proceed. *See id.*

Because qualified immunity is an affirmative defense, the defendant bears the burden to plead it. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). The burden then shifts to plaintiff, to show that the officer violated a right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotes omitted).

The Court now analyzes qualified immunity in the context of each of Plaintiffs' claims against Defendants: 1) fabrication of evidence; 2) malicious prosecution; and 3) *Brady* violations.

### 1. Fabrication of Evidence

A fabrication of evidence claim has two elements: (1) a defendant knowingly fabricated evidence against the plaintiff, and (2) there is a reasonable likelihood that the false evidence could have affected the judgment of the jury. *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017).

As a preliminary matter, Defendants argue that fabrication of evidence cannot be brought as a stand-alone claim. They say it merges with Plaintiffs'

malicious prosecution claim because the two causes of action are virtually identical. This is false.

Consistently, courts at all levels of the federal judiciary allow defendants to bring fabrication of evidence claims as well as malicious prosecution claims. *See McDonough v. Smith*, 139 S. Ct. 2149 (2019) (Plaintiffs brought both a fabrication of evidence and malicious prosecution claim, the Supreme Court found nothing improper about the claims being brought together, and analyzed each issue separately, signaling that the two causes of action are distinct); *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) (same); *Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017) (same); *Hoskins v. Knox Cnty.*, No. 6:17-CV-84-REW-HAI, 2020 WL 1442668 (E.D. Ky. Mar. 23, 2020) (same); *France v. Lucas*, 836 F.3d 612 (6th Cir. 2016) (same); *Virgil v. City of Newport*, 545 F. Supp. 3d 444 (E.D. Ky. 2021) (same); *Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013) (same).

Indeed, in the very case that Defendants rely on in their supplemental brief to show they are entitled to qualified immunity, *Price v. Montgomery Cnty., Kentucky*, the Sixth Circuit analyzes the plaintiff's stand-alone fabrication of evidence claim along with their malicious prosecution claim with ease. *See Price v. Montgomery Cnty., Kentucky*, No. 21-6076, 2023 WL

4346954 at *8 (6th Cir. July 5, 2023).

The elements of both claims are also distinct. For example, lack of probable cause to arrest is not an element of a fabrication claim, but it is an element of malicious prosecution. *See id.* While the presence of probable cause defeats a malicious prosecution claim, the presence of probable cause does not defeat a fabrication claim. *See Morris v. Boyd*, No. 00-1249, 2000 WL 1720621, (6th Cir. Nov. 7, 2000).

Additionally, separate harms are alleged: the harm caused by a state official deliberately concocting false evidence, and the harm caused by a state official who wrongfully subjects a criminal defendant to a long, painful, and stigmatizing criminal justice process. In other words, fabrication is focused on the immediate harm caused by falsifying evidence, while malicious prosecution focuses on the prolonged harm caused by dragging an innocent person through the criminal legal system and obtaining a false conviction. The distinct rationale behind both calls for separate causes of action.

For example, in *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014), the Third Circuit rejected the argument that fabrication claims must be tied to malicious prosecution claims, concluding that "no sensible concept of

ordered liberty is consistent with law enforcement cooking up its own evidence." *Id.* at 293.

The Court finds that a fabrication of evidence claim may be brought separate, and in addition to, a malicious prosecution claim.

The Court is free to consider the two prongs of qualified immunity in whatever order is appropriate in light of the issues before it. *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009).

> a) It was clearly established in 2002 that a police officer could not knowingly coerce a witness into giving falsified testimony.

The doctrine of qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (1982). A clearly established right, the Supreme Court explains, is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curium*) (citations omitted). The Court "[does] not require a case directly on point, but existing precedent must have placed the

statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

The first step of the "clearly established" analysis is to define the right at issue "at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). The Supreme Court cautioned that clearly established law should not be defined "at a high level of generality." *Mullenix*, 577 U.S. at 12. "[T]he right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (internal citation omitted).

The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotes omitted) (emphasis added by *Mullenix* court). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.*

It is important to note that *Wilson*, *Mullenix*, and *Reichle* "do not require a case directly on point." *Id.* at 12. Further, "the very action in question need

not have previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotes omitted). As the *Hope* court explains, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741 (internal quotes omitted).

After defining the right at issue at an appropriate level of specificity, a court must next ask whether "every reasonable official would have understood that what he is doing violates" that particularized right. *Reichle*, 566 U.S. at 664 (citations, brackets, and internal quotation marks omitted). Although the action in question need not have previously been held unlawful (*see Hope*, *supra*), "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664 (citation omitted).

With respect to the facts at hand, this Court must "decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). It was.

17

Plaintiffs allege that Defendants used threats and manipulation to coerce Bearia Stewart and Tammy Wiseman into giving witness testimony that Defendants knew was false, and that Defendants attempted to do the same with Tyrhonda Moore.

In 2002, it was clearly established that such acts violate a defendant's constitutional rights. *See Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) (saying same) (relying on *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)).

*Jackson*'s facts are as follows. On May 19, 1975, Edward Vernon, then twelve years old, rode the bus home from school and heard two gunshots. *Id.* at 803. Coming upon the scene, Vernon found a gunshot victim, but nothing to indicate who was responsible for the shooting. *Id.* at 804. After police secured the area, Vernon left and met with a friend, who told him that the perpetrators were the three plaintiffs. *Id.* Vernon returned to the crime scene and told an officer that he knew who had committed the shooting. *Id.* At the station, he told police officers that plaintiffs were the shooters and gave their descriptions, which he was able to do because he knew them from the neighborhood. *Id.*

The detectives asked Vernon to identify the shooters in a line-up. *Id.* According to Vernon, officers asked him if "I see anybody that I recognize up there," which he interpreted as asking whether he had seen anyone in the line-up actually commit the shooting. *Id.* Vernon replied that he had not. *Id.*

The detectives accused him of lying, threatened to send his parents to jail for perjury, banged on a table, and used racial slurs to describe Vernon. *Id.* After he began to cry, they left the room, returned, and gave him a piece of paper saying he had failed to identify two of the plaintiffs in the line-up because he was scared of their retaliation. *Id.* The officers told Vernon to sign the statement. *Id.* He did. *Id.*

At trial, Vernon testified consistently with the statement. *Id.* Based on Vernon's testimony, a jury convicted plaintiffs of murder. *Id.* A judge sentenced them to death, but later reduced their sentences to life imprisonment*. Id.*

40 years later, Vernon formally recanted his testimony, disclosing for the first time that police officers coerced him to testify falsely. *Id.* After Vernon's recantation, the state prosecutor admitted that there was "no evidence tying any of the three convicted defendants to the crimes" and that "[t]hey have been victims of a terrible injustice." *Id.* (internal cites omitted). A court

overturned plaintiffs' convictions. *Id.* at 802. They had served 39, 37, and 25 years in prison for a crime they did not commit. *Id.*

In 2015, the exonerated men filed suit in the Northern District of Ohio, alleging § 1983 claims based on violations of their constitutional rights by the officers and the City of Cleveland. *Id.* at 802. The claims against the officers included a *Brady* claim, fabrication of evidence, and malicious prosecution. *Id.* The only living defendant moved for summary judgment, arguing that he was not involved in any unconstitutional police activity in 1975 and that, even if he was, he was protected by qualified immunity. *Id.* at 806. The district court granted the motion. *Id.*

The Sixth Circuit reversed. *Id.* It reasoned that "[i]t is difficult to countenance any argument that a law enforcement officer in 1975 would not be on notice his conduct was unlawful when coercing a witness into perjuring himself in a capital trial." *Id.* at 825 (omitting brackets and internal quotes). The court went on: "[t]he obvious injustice inherent in fabricating evidence to convict three innocent men of a capital offense put [Defendant] on notice that his conduct was unlawful." *Id.*

The Sixth Circuit noted that "in 1942, the Supreme Court held that when a witness perjures himself because of threats from police officers, the

defendant suffers 'a deprivation of rights guaranteed by the Federal Constitution.'" *Id.* (quoting *Pyle*, 317 U.S. at 216). And even "as far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates the fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* (citing *Mooney*, 294 U.S. at 112).

*Jackson* was decided well after the underlying facts of this case took place. However, *Jackson* relied on binding case law to conclude that it was clearly established in 1975 that knowingly fabricating witness testimony through coercion was unconstitutional. *See Jackson, supra,* relying on *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."); *Stemler*, 126 F.3d at 872  (same); *Mooney*, 294 U.S. 103 at 112  (the introduction of fabricated evidence violates "the fundamental conceptions of justice which lie at the base of our civil and political institutions."); *Pyle*, 317 U.S. at 216 (when a witness perjures himself because of threats from police officers, the defendant suffers "a deprivation of rights guaranteed by the Federal Constitution.").

21

The Court is satisfied that it was clearly established in 2002 that a police officer could not knowingly fabricate witness testimony through threats and coercion. Plaintiffs meet their burden to show that "existing precedent. . . placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Defendants argue that the "clearly established" inquiry should be whether it was clearly established that their "rough" interrogation tactics were unconstitutional, not whether it was clearly established that it was unconstitutional for a police officer to knowingly fabricate witness testimony through threats and coercion. They argue that any other interpretation of the officer's actions would be framing the clearly established inquiry at "too high" a level of generality, which violates the Supreme Court's directive in *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cautioning that clearly established law should not be defined "at a high level of generality").

The Court disagrees. Defendants attempt to obfuscate the relevant conduct in order to shirk potential liability. The question is not whether Defendants used sound interrogation tactics, but whether the officers coerced vulnerable witnesses to testify to something they knew or had reason to know was false. That is the essence of a fabrication of evidence claim.

22

"[T]he right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (internal citation omitted).

The right Defendants allegedly violated is particularized, detailed, and specific. *Gregory*, *Stemler*, *Mooney*, *Pyle*, and *Jackson* all support that the case law is clear that the unlawfulness of Defendants' alleged actions was clearly established at the time they occurred, and "existing precedent . . . placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The clearly established prong is satisfied.

The Court now analyzes whether Plaintiffs' facts, taken as true, establish a constitutional violation in each of their fabrication claims: the fabrication of Bearia Stewart's testimony; the fabrication of Tammy Wiseman's testimony; and the attempted fabrication of Tyrhonda Moore's police statement.

### b) Bearia Stewart Fabrication

Plaintiffs allege that Defendants fabricated Bearia Stewart's preliminary exam testimonies by coercing her to testify to something they

knew was false.

Restated, a fabrication of evidence claim has two elements: (1) a defendant knowingly fabricated evidence against the plaintiff, and (2) there is a reasonable likelihood that the false evidence could have affected the judgment of the jury. *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017). Fact issues exist to support that both prongs are satisfied.

First, Defendants argue that a reasonable jury could not find that they knowingly fabricated Stewart's testimony because on the day they interrogated her (one day after the murder), they had no reason to know that she was lying. They say that unlike the officers in *Jackson*, Defendants did not write Stewart's statement for her or tell her exactly what to say. They argue that mere coercion, without the knowledge that the statement was false, is not fabrication of evidence.

Defendants also allege that *Price v. Montgomery Cnty., Kentucky*, No. 21-6076, 2023 WL 4346954 (6th Cir. July 5, 2023) supports that they are entitled to qualified immunity. There, the Sixth Circuit held that where a police officer coerces a witness into giving a statement, but there is no evidence to indicate that the officer knew the witness was lying, a fabrication of evidence claim cannot survive because the officer had no knowledge of the

statement's falsity. *See id.* at *8.

This is true. The Court does not dispute that coercion alone, without more, cannot rise to the level of fabrication. *See id; see also Jackson*, *supra*. Nevertheless, *Price* does not bar Plaintiffs' recovery, because unlike the plaintiff there, Clark and Harrington allege more than just coercion.

If the fabricated statement in question was Stewart's witness statement taken on September 27, 2002 (the day after Martin's murder), Plaintiffs' claim would likely fail. This is because, at that point in time, there was likely not enough evidence for Defendants to *know* that Stewart was lying in her statement (though she denied knowing anything about the crime at least 26 times, and she only changed her story after Defendants threatened to take away her kids).

However, by the time of Clark and Harrington's preliminary examinations (which took place on October 23, 2002, and October 30, 2002, respectively), enough evidence had come to light to support a jury finding that Defendants knew, or should have known, that Stewart's eyewitness account was false.

In her September 27, 2002, interrogation, Stewart told the officers that Martin's murder occurred around 11-11:30 p.m. the night before. [ECF No.

25

153-19, PageID.5964]. On September 30, 2002, Tyrhonda Moore gave a statement to police that she was with Clark the night of the murder until 4 a.m. in the morning, and that he could not have committed the crime. [ECF No. 138-7, PageID.4164].

Defendants obtained Moore's statement almost an entire month before Plaintiffs' preliminary exams. This evidences that Defendants knew, or should have known, that Stewart was lying about witnessing the murder. In addition to having Moore's statement alibi-ing Clark, by the time of the preliminary exams, Defendants knew that Stewart repeatedly denied knowing anything about the crime, that she was wildly inconsistent during her interrogation, and that they had pressured her into giving a statement by threatening to take away her children. Rather than attempting to re-interview her after the Moore alibi arose to determine the accuracy and truthfulness of her statement, Defendants relied on Stewart's highly suspect account of the murder and had her testify under oath at the preliminary exams in accordance with it.

Defendants were on notice that Stewart's alleged eyewitness account was probably false. Taken together, a reasonable jury could find that Defendants fabricated evidence (Stewart's preliminary exam testimonies)

against Plaintiffs by coercing her to testify to something they knew or had reason to know was false.

Regarding the last element of a fabrication claim, there is more than a reasonable likelihood that the false evidence could have affected the judgment of the jury in Plaintiffs' criminal trials. A jury convicted Plaintiffs almost exclusively on Bearia Stewart's testimony. No other evidence tied them to the scene. Without Stewart's incriminating testimony, it is unlikely that a jury would have found them guilty. Thus, there are fact issues which support that the last element of a fabrication claim is satisfied.

A reasonable jury could find that Defendants fabricated Stewart's statement when they knowingly coerced her into falsely implicating Plaintiffs. Plaintiffs satisfy both the "clearly established" and "constitutional violation" prongs of the qualified immunity analysis against both Defendants regarding Stewart's fabrication claim.

### c) Tammy Wiseman Fabrication

Plaintiffs allege that Defendants fabricated Tammy Wiseman's testimony in their joint trial by coercing her to testify to something they knew was false.

The allegedly fabricated Wiseman testimony was that Plaintiffs and

their counsel pressured Wiseman to testify that she was with Bearia Stewart the night of the murder, even though she was not. After Plaintiffs' first trial, Wiseman recanted her testimony. She testified in Harrington's subsequent trials that she was with Stewart the night of the murder, but that Abdallah coerced her to testify that Plaintiffs threatened her because Abdallah threatened to lock Wiseman up, take away her kids, and helped her with a criminal matter of her own. In other words, Plaintiffs argue that, just as Defendants allegedly did with Stewart, they used threats and coercion to get Wiseman to testify to a statement that they knew was false.

Plaintiffs concede that there is no evidence showing that Defendant Smith had any interactions with Wiseman. The Court **GRANTS** summary judgment to Smith on this claim.

Have Plaintiffs presented issues of fact to support that Abdallah violated their constitutional rights given his treatment of Wiseman? The Court says yes.

First, a jury could find that Abdallah knowingly fabricated Wiseman's testimony. Abdallah interviewed Wiseman on January 29, 2003, at the Taylor police department. She was incarcerated for suspected retail theft. Wiseman testified that Abdallah pressured her to testify against Plaintiffs in their joint

trial. At the beginning of her January 29 interview with Abdallah, Wiseman told him that she was with Stewart well into the night of the murder, so Stewart probably could not have seen what she claimed she saw.

Wiseman says that Abdallah told her "over and over and over" that she was lying, [ECF No. 138-20, PageID.4376], and that he threatened to take her children away and lock her up unless she told him what he wanted to hear. Wiseman alleges that she actually *was* with Stewart the night of the murder, but that she lied on the stand and claimed Plaintiffs threatened her because she 1) was scared of the Inkster Police Department; 2) did not want the police to take away her kids; 3) was going through drug withdrawal during the interview; and 4) just wanted to go home.

Wiseman also alleges that Abdallah insinuated that he would help her with her retail fraud charge if she testified against Plaintiffs. His help came in the form of Wiseman's release from custody without paying bond, right after she signed the allegedly false statement against Plaintiffs. On these facts, a reasonable jury could find that Abdallah coerced Wiseman to testify to something that he knew or had reason to know was false.

Abdallah argues that because Wiseman concedes that Abdallah "didn't tell her what to say," a fabrication claim based on the Wiseman testimony

29

cannot survive. However, there are still fact issues to support that Abdallah knew she was lying, and that he coerced her to testify in accordance with that lie. When Wiseman told Abdallah at the beginning of their interview that she was with Stewart the night of the murder, Abdallah told her "over and over" that she was lying, threatened to take away her kids, and threatened to lock her up.

Second, there is a reasonable likelihood that Wiseman's allegedly false evidence could have affected the judgment of Plaintiffs' jury in their first trial.

Wiseman testified at the first trial that Plaintiffs told her to lie on the stand for them, and that once they found out that she was testifying for the prosecution, they called her and sent a threatening letter urging her not to take the stand for the state. If the jury knew Wiseman's testimony was false, this reasonably could have affected its decision to find Plaintiffs guilty.

Though Defendants do not make this argument, the Court anticipates that they will assert that knowledge that the Wiseman evidence was allegedly fabricated could not have reasonably affected the judgment of the jury in relation to Harrington, because Harrington's fourth jury knew about the Wiseman fabrication and convicted him anyway.

The Court believes this rationale, though reasonable, is misplaced.

30

The inquiry into whether there is a reasonable likelihood that Wiseman's false evidence could have affected the jury's judgment is a theoretical one. This Court must look at whether, at the time of Plaintiffs' original trial where the false evidence was introduced, knowledge of the fabrication may have reasonably affected the jury's decision to find Plaintiffs guilty. *See Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (outlining the elements of a fabrication claim). The answer is yes.

It is exceedingly difficult to consider what happened in Harrington's subsequent trials and *retroactively apply that* to conclude that at Plaintiffs' first trial, the Wiseman evidence could not have affected the jury's judgment. That is like saying: "The Wiseman evidence could not have affected the jury's judgment in 2003 because the Wiseman evidence did not affect the jury's judgment in 2006."

Assessing subsequent events and retroactively applying them to the past contravenes vital legal principles. For example, the legal system generally operates within the bounds of time and evidence available at the time a case is heard. The principle of "*ex post facto*" prohibits the retroactive application of laws or rules to previous actions or events. U.S. Const. art. I, § 9, cl. 3; *see also* art. I, § 10, cl. 1. "So much importance did the [c]onvention

31

attach to [the ex post facto prohibition], that it is found twice in the Constitution." *Kring v. Missouri*, 107 U.S. 221, 227 (1883).

With these principles in mind, the Court cannot in good conscience apply the decision of Harrington's fourth jury to the decision of his first. There is a reasonable likelihood that, at the time the state introduced the false Wiseman testimony to the jury in Plaintiffs' original trial, the false testimony could have affected that jury's judgment.

The Court declines to grant Abdallah qualified immunity on this claim.

### d) Tyrhonda Moore Fabrication

Finally, Plaintiffs bring a fabrication claim against Defendants in relation to Tyrhonda Moore.

Moore never changed her story that she was with Clark the night of the murder. Plaintiffs concede they cannot establish a fabrication claim based on the facts alleged. The Court **DISMISSES** this claim against Defendants.

### 2. Malicious Prosecution

Plaintiffs filed both federal and state malicious prosecution claims.

### a) Federal malicious prosecution

Defendants concede that in 2002, it was clearly established that a police officer could not maliciously prosecute a criminal defendant. The Court

turns its attention to the second prong of qualified immunity: whether Plaintiffs sufficiently allege a constitutional violation.

Federal malicious prosecution contains four elements: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017).

Fact issues exist to support that Defendants maliciously prosecuted Plaintiffs under federal law.

First, it is undisputed that Defendants "influenced" the decision to prosecute because of their allegedly fabricated Bearia Stewart evidence.

Second, probable cause for Plaintiffs' continued detentions was established solely by Bearia Stewart's fabricated testimony at the preliminary examinations, which was ultimately read to the jury in the first joint trial that resulted in Clark's conviction, and Harrington's fourth trial that resulted in his conviction. Given that Stewart's eyewitness testimony was the only evidence

used to establish probable cause and Plaintiffs allege the testimony to be fabricated, fact issues exist to support that there was no probable cause to prosecute Plaintiffs.

Third, Plaintiffs suffered deprivations of liberty; they were allegedly wrongfully incarcerated for seventeen years.

Last, the criminal proceeding was resolved in Plaintiffs' favor; their convictions were vacated. If Plaintiffs' facts are taken as true, a jury could find that Defendants engaged in malicious prosecution.

The only malicious prosecution element that Defendants dispute is whether probable cause to arrest existed. Defendants argue that probable cause existed because a reasonable officer would believe that Clark and Harrington committed the murder based on 1) Stewart's indication that Clark is a drug dealer and is known to carry a gun, and that Martin was murdered with a gun over a drug/money dispute; 2) Stewart's fear and changing details in her stories was due to the intimidation she received from Plaintiffs; 3) Stewart's description of Clark's car and appearance; 4) Stewart placing Clark and Harrington at the scene of the murder, and describing the actions they took to murder Martin; and 5) a neighbor hearing gunshots in the same time frame as Stewart's story.

In response, Plaintiffs argue that a jury must decide whether probable cause existed; whether Stewart's testimony was fabricated is a question of fact, and because her testimony was the only evidence that established probable cause, the question of probable cause has to be a question of fact as well.

The Court agrees with Plaintiffs. "In general, the existence of probable cause in a Section 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). The Court is not convinced that only one reasonable determination on the issue of probable cause is possible. The probable cause determination rests on "the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). What Plaintiffs outline, as well as the enumerated list that Defendants provide to support that probable cause existed, all support that the issue rightfully belongs with the jury, which can consider the evidence presented, assess the totality of the circumstances, and make the ultimate determination.

Because the question of probable cause presents a jury issue and Plaintiffs otherwise provide sufficient facts to establish their federal malicious

prosecution claim, the Court **DENIES** qualified immunity to both Defendants on this claim.

### b) State malicious prosecution

Fact issues exist to support that Defendants maliciously prosecuted Plaintiffs under state law.

Under Michigan law, to state a prima facie case of malicious prosecution, Plaintiffs must prove: 1) prior proceedings terminated in favor of the present plaintiff; 2) absence of probable cause for those proceedings; 3) malice, defined as a purpose other than that of securing the proper adjudication of the claim; and 4) a special injury that flows directly from the prior proceedings." *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (citing *Payton v. City of Detroit*, 211 Mich. App. 375, 536 N.W.2d 233, 242 (1995)). The malice required for a state law malicious prosecution claim may be inferred from a lack of probable cause to arrest. *See Renda v. Int'l Union, United Auto., Aircraft & Agr. Implement Workers of Am.*, 366 Mich. 58, 97, 114 N.W.2d 343, 362 (1962).

The only difference between a state law malicious prosecution claim and a federal law malicious prosecution claim is the requirement of malice under Michigan law. Malice can be inferred from the lack of probable cause.

Plaintiffs present fact issues on whether probable cause existed. It follows that there are fact issues as to whether malice exists in their state law claim. This, coupled with the reasons above regarding the other shared elements of malicious prosecution, supports that Defendants are not entitled to summary judgment on Plaintiffs' state law malicious prosecution claim.

### 3. *Brady* Violations

The final category of claims Plaintiffs bring are "*Brady* claims."

Plaintiffs claim that Defendants violated their duty to disclose material exculpatory and impeachment evidence to Plaintiffs' defense attorneys under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Particularly, they allege that Abdallah and Smith failed to tell Plaintiffs' criminal defense team that: (1) they illegally jailed and threatened Tyrhonda Moore to ensure she did not testify as an alibi witness for Clark; (2) Detective Hill relayed information to them from his stepdaughter, Kaneka Jackson, that she had seen the shooter and Clark was not involved in the murder; and (3) Abdallah met with, and fabricated, Tammy Wiseman's witness testimony by threatening to take away her kids, threatening to lock her up, and by helping her with her criminal case in exchange for her testimony.

Defendants concede that in 2002, it was clearly established that it was unconstitutional for a police officer to withhold evidence favorable to the

criminal defense under *Brady*. In light of this, the Court need only address the second qualified immunity prong: whether Plaintiffs present sufficient evidence to support that a constitutional violation occurred in each of their *Brady* claims.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87. The purpose of this rule is to "avoid[] . . . an unfair trial to the accused."  *Id*. Prosecutors are not the only state actors bound by *Brady*; indeed, "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material."  *Jackson*, 925 F.3d at 814 (citation omitted).

*Brady* applies to information "known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  "There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*,

38

161 F.3d 320, 344 (6th Cir. 1998) (citations and internal quotation marks omitted).

*Brady* claims have three elements: (1) the evidence is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the state, either willfully or inadvertently, suppressed the evidence; and (3) prejudice ensued. *Jackson*, 925 F.3d at 814.

### a) Tammy Wiseman *Brady* evidence

Fact issues exist to support that Abdallah committed a *Brady* violation with respect to evidence involving Tammy Wiseman.

Plaintiffs allege Defendants violated Brady by withholding the fact that Abdallah fabricated Wiseman's testimony by threatening her with jail, threatening to take her kids away, and helping her with her criminal case in Taylor in exchange for her testimony against Defendants.

The Court grants summary judgment to Smith on this claim; Plaintiffs fail to allege that Smith was involved with Wiseman or knew of Abdallah's interaction with her. On the other hand, Plaintiffs allege sufficient facts for a jury to find that Abdallah violated *Brady*.

At the beginning of her meeting with Abdallah, Wiseman told him she was with Bearia Stewart at the time of the murder. This would have

impeached Stewart's testimony that she witnessed Plaintiffs at the murder scene, and it would have significantly undermined the state's case against Clark and Harrington.  *See Moldowan*, 578 F.3d at 378; *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) ("Considerable authority from the Supreme Court and our court indicates that a defendant suffers [*Brady*] prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness.").  Wiseman alleges that after Abdallah pressured and threatened her, she changed her story and testified at the first trial that Clark's and Harrington's attorneys asked her to falsely testify that she was with Stewart at the time of the murder.

This evidence would have been relevant to impeach Abdallah and undermine the investigation.  Additionally, had Abdallah disclosed evidence that Wiseman planned to testify that she was with Stewart but changed her testimony after Abdallah threatened her and offered to get her released from police custody in Taylor, Plaintiffs could have used this information to impeach Stewart. A jury could conclude that Abdallah committed a *Brady* violation by not disclosing this information to Plaintiffs' defense attorneys.

Plaintiffs allege enough facts to show that 1) the Wiseman evidence is favorable impeachment evidence; 2) the state suppressed the evidence; and

3) prejudice ensued.

This claim against Abdallah survives summary judgment.

### b) Tyrhonda Moore *Brady* evidence

Fact issues exist to support that Abdallah committed a *Brady* violation with respect to evidence involving Tyrhonda Moore.

On the other hand, Smith is entitled to summary judgment; Plaintiffs fail to present evidence that he was involved with Moore or knew of Abdallah's alleged interactions with her.

On September 30, 2002, Moore went to the Inkster Police Department and spoke to Abdallah.  She told the detective that they had arrested the wrong person because she was with Clark throughout the night of September 26-27.  Plaintiffs allege that Abdallah accused Moore of lying, held her for two to three days without charging her with a crime, threatened to arrest her, and said she needed to change her story. She did not. After Abdallah released her, Moore says she moved to Tennessee because she was afraid of the police.

Defendants argue that Plaintiffs' *Brady* claim cannot survive summary judgment with respect to Moore because the defense knew of Moore, and

even contemplated calling her as an alibi witness. But Defendants misapprehend Plaintiffs' claim. While Plaintiffs knew about Moore, that is not the *Brady* evidence at issue. The relevant evidence for Plaintiffs' *Brady* claim is that Abdallah allegedly threatened and detained Moore for multiple days. Plaintiffs' claim does not rest on whether they knew or did not know of Moore as an alibi witness; their claim is that Defendants failed to disclose that Abdallah threatened Moore, imprisoned her for multiple days, and pressured her to change her story.

Further, a question of fact exists regarding the nature of Abdallah's interaction with Moore. For example, if the jury believes Moore's testimony that Abdallah held her for three days, pressured her to change her story to say that she was not with Clark during the time of the murder, and threatened to charge her with obstruction of justice and/or accessory [*see* ECF No. 153-20, PageID.5979-5981], the jury could find that Abdallah's failure to disclose this information violated *Brady*.

This evidence would be favorable to Plaintiffs because it could impeach Abdallah (and possibly the other officers) and undermine the state's case. *See Jackson*, 925 F.3d at 814; *Moldowan v. City of Warren*, 578 F.3d 351, 378 (6th Cir. 2009) (police have a *Brady* duty to "inform the prosecutor

about evidence that undermine[s] the state's preferred theory of the crime."). If believed, the evidence regarding Abdallah's treatment and attempted coercion of Moore would have undermined the integrity of the investigation and supported Plaintiffs' claim that officers fabricated evidence.

Plaintiffs allege enough facts to show that 1) the Moore evidence is favorable impeachment evidence; 2) the state suppressed the evidence; and 3) prejudice ensued.

This claim against Abdallah survives.

### c) Kaneka Jackson *Brady* evidence

Plaintiffs allege Defendants violated *Brady* by failing to tell the prosecutor that Detective Hill relayed information from his stepdaughter, Kaneka Jackson, that she had seen the shooter and Clark was not involved in the murder. Plaintiffs say this was exculpatory evidence, as well as impeachment evidence because it contradicted Stewart's fabricated eyewitness account.

Defendants say there is no admissible evidence showing they were aware of Jackson or her statement. Jackson testified at her deposition that she never spoke with Abdallah or Smith; she only testified that Hill told her he reported what she said to the "investigating officers."

43

Defendants suggest three problems with this: (1) it is hearsay because it is an out of court statement being offered for the truth of the matter asserted; (2) there is no substance as to what the "investigating officers" were allegedly told; and (3) there is no identification of what "investigating officers" Hill may have been referring to.

Plaintiffs fail to respond to Defendants' argument that there is no admissible evidence to support that Abdallah and Smith knew of Kaneka Jackson, or what she allegedly told Hill. *See* [ECF No. 138, PageID.4053] (Defendants raise the arguments); *and* [ECF No. 153, PageID.4875] (Plaintiffs fail to respond). The issue is waived. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997).

Further, notwithstanding whether Jackson's statement that Hill told her he reported what she said to the "investigating officers" is hearsay, Defendants are entitled to summary judgment because Plaintiffs fail to provide evidence regarding: (1) the substance of what Hill allegedly told the "investigating

officers"; and (2) the identity of the alleged "investigating officers" Hill told.

To find in favor of Plaintiffs, a juror would need to speculate that the "investigating officers" Hill allegedly told were Abdallah and Smith. The jurors would also have to speculate regarding what Hill told them. Speculative evidence, when there is no support for the facts being speculated about in the record, cannot be brought before a jury. *See Samuels v. Allstate Prop. & Cas. Ins. Co.*, 310 F. Supp. 3d 847, 866-7 (E.D. Mich. 2018).

The Court **DISMISSES** this claim.

### B) Hearsay

The Court finds that Bearia Stewart's former trial testimonies are admissible against Defendants, but her recantation affidavits are not.

### 1. Bearia Stewart's trial testimonies are admissible against Defendants under the "former testimony" hearsay exception.

Hearsay is an out of court statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). Hearsay is inadmissible unless a federal statute or hearsay exception exists. Fed. R. Evid. 802.

In civil cases, Rule 804(b)(1) of the Federal Rules of Evidence (the

"former testimony" exception) holds that if the declarant is unavailable, testimony given by the declarant as a witness in another hearing is not barred by the hearsay rules so long as the party against whom the testimony is now being offered, or that party's "predecessor in interest," had an opportunity and similar motive to confront the testimony at the prior hearing. *See id.* at Rule 804(b)(1).

The parties only dispute whether the state prosecutors in the underlying criminal action are predecessors in interest to Defendants in the present civil action.

In the Sixth Circuit, a predecessor in interest is anyone who had a similar motive and opportunity to develop the declarant's testimony, at the time it was given, as the opponent would have at the current trial. *In re Bruner*, 561 B.R. 397, 411 (B.A.P. 6th Cir. 2017). "The Sixth Circuit's interpretation of 'predecessor in interest' is generous and practical." *Id.* A "previous party having like motive to develop the testimony about the same material fact is, in the final analysis, a predecessor in interest to the present party." *Clay v. Johns–Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983).

Defendants argue that the state prosecutors are not predecessors in

interest because the prosecutors' motive was to gain a conviction, while their motive is to "delve into the specifics of the officer's actions." [ECF No. 138, PageID.4041]. Defendants also assert that their motive is to investigate every detail about what Stewart claims the officers did and not shy away from these details in front of a criminal jury like the prosecutor's motive would have been.

The Court is unpersuaded. To say that Plaintiffs' former prosecutors and the arresting officers did not have a "like motive"—to establish Plaintiffs' guilt—is disingenuous. "In both cases, the interest of the prosecutor and defendants was identical: show that Plaintiffs were guilty of murder by impeaching Ms. Stewart's credibility when she recanted in subsequent testimony." [ECF No. 153, PageID.4866-7]. As Plaintiffs assert, "Defendants and their counsel cannot claim with a straight face that they would not attack Ms. Stewart's recantations any differently than did the prosecutor: they both have tried to show Plaintiffs were guilty of murder by showing that Stewart's recantation was the product of threats by Plaintiffs' family members." *Id.*

The Court is satisfied that Defendants and Plaintiffs' former prosecutors are predecessors in interest. Because no other element of the former testimony exception is in dispute, the Court finds that Stewart's testimony is admissible under Rule 804(b)(1).

47

Alternatively, Defendants argue that Stewart's testimonies taken at four separate trials are inadmissible because Plaintiffs did not show that "each and every one" of her statements in her testimonies meets a hearsay exception. They cite *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995), which states that "[b]ecause the term 'statement' also signifies 'a single declaration or remark' for purposes of Rule 804(b)(5), a court, when determining the admissibility of a narrative, must examine it sentence by sentence and rule upon the admissibility of each 'single declaration or remark.'" *Id.*

*Canan* can be distinguished for multiple reasons. First, the court there dealt with a statement admitted under the residual hearsay exception, which is amorphous, vague, and warrants heightened scrutiny so litigants are not encouraged to evade the rules of hearsay by sneaking inadmissible statements in through a catch-all provision. That is not the case here. The general principle behind the "former testimony" hearsay exception is that courts find testimony given under oath and in open court to be highly reliable. *See* Fed. R. Evid. 804(b)(1) (advisory committee's note) ("Former testimony does not rely upon some set of circumstances to substitute for oath and cross-examination, since both oath and opportunity to cross-examine were present in fact. . . . Hence it may be argued that former testimony is the

48

strongest hearsay.").

Additionally, the *Canan* rule applies to narratives, not trial testimony taken under oath and considered to be much more trustworthy. Defendants provide no authority to support that, in the case of sworn trial testimony, a proponent must prove that every single statement within the sworn testimony is admissible under a hearsay exception. The Federal Rules of Evidence do not contemplate this.

The Court finds that Stewart's testimony at Defendants' trials meet the requirements of the former testimony hearsay exception, and each of her testimonies is admissible against Defendants. Because Stewart's testimonies fall within the former hearsay exception, the Court need not discuss whether other hearsay exceptions apply.

### 2. Bearia Stewart's recantation affidavits are inadmissible hearsay.

Defendants argue that Stewart's recantation affidavits are hearsay with no exception.

Plaintiffs fail to respond; the issue is waived. *See McPherson*, 125 F.3d at 995–96. The Court finds that Stewart's recantation affidavits are inadmissible hearsay.

However, the Court notes that most of the substance of Stewart's recantation affidavits will come in regardless through her former testimony; Stewart repeated most of what exists in her recantation affidavits in open court.

## V.     CONCLUSION

The Court **GRANTS** in part and **DENIES** in part Defendants' summary judgment motion.

The Court **GRANTS** Abdallah qualified immunity with respect to Tyrhonda Moore's fabrication and the Kaneka Jackson *Brady* claim.

The Court **DENIES** qualified immunity to Abdallah on the following claims; they will proceed to trial:

1) fabrication of Bearia Stewart's eyewitness testimony;

2) fabrication of Tammy Wiseman's witness testimony;

3) federal malicious prosecution;

4) state law malicious prosecution;

5) *Brady* violation in relation to the Moore evidence; and

6) *Brady* violation in relation to the Wiseman evidence.

The Court **GRANTS** Smith qualified immunity with respect to the following claims: Wiseman fabrication; Moore fabrication; Moore *Brady*; Jackson *Brady*; and Wiseman *Brady*.

The Court **DENIES** qualified immunity to Smith on the following claims; they will proceed to trial:

1) fabrication of Stewart's eyewitness testimony;

2) federal malicious prosecution; and

3) state law malicious prosecution.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  7/28/2023