UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE CLARK, et al.,

    Plaintiff,

v.

ANTHONY ABDALLAH, et al.,

    Defendants.
_____/

Case No. 21-10001
Honorable Victoria A. Roberts
Magistrate Elizabeth A. Stafford

## ORDER GRANTING DEFENDANT CITY OF INKSTER'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 136]

### I. INTRODUCTION

This case places two competing public interests on a collision course: the interest in allowing individuals to file *Monell* claims in federal courts against local units of government under 42 U.S.C. § 1983 to protect civil rights, and the interest in upholding settlement agreements voluntarily and intelligently entered.

George Clark and Kevin Harrington ("Plaintiffs") sue the City of Inkster ("Inkster") under 42 U.S.C. § 1983 for failure to train, and police officers Anthony Abdallah, Kevin Smith, and John Hermann (as personal representative for the Estate of Gregory Hill) for fabrication of evidence,

1

malicious prosecution, and Brady violations, which resulted in Plaintiffs' wrongful convictions for murder.

Before the Court is Inkster's motion for summary judgment. Because Clark and Harrington voluntarily released Inkster from all potential liability when they accepted monetary awards under the Michigan Wrongful Imprisonment Compensation Act ("WICA"), the release agreements are an affirmative defense to their claims and bar Plaintiffs' federal *Monell* suit.

The Court **GRANTS** Inkster's motion.

## II. FACTUAL BACKGROUND

In 2003, a jury convicted Harrington and Clark of the murder of Michael Martin based almost exclusively on the questionable witness testimony of Bearia Stewart. The trial court sentenced the two men to life in prison. In 2020, Harrington and Clark were freed after the Wayne County Prosecutor's Office Conviction Integrity Unit dropped all charges, citing police mishandling of the case. The prosecutor's office declined to retry them.

On October 28, 2020, Clark entered into a stipulated order of judgment with the state of Michigan. The state agreed to pay him $853,858.67 under WICA. [ECF No.136-2]. That same day, Harrington entered into a nearly identical stipulated order of judgment, in the amount of $753,171.02. *Id.*

2

WICA allows Plaintiffs to sue state or local officers in federal court even though they accepted monetary awards from the state. *See* MCL 691.1755(8). The parties dispute whether WICA allows federal suits against units of government post settlement.

Inkster filed a motion for summary judgment. It says Plaintiffs waived their right to sue the city when they voluntarily released the state (including its political subdivisions) from all liability under WICA's section 691.1755(8). Alternatively, Inkster argues that no evidence of failure to train or unconstitutional policies exist, and it is entitled to summary judgment for those reasons as well.

Plaintiffs argue that WICA does not bar a federal *Monell* claim against Inkster. They say the statute is ambiguous and sufficient factual disputes exist to warrant denial of summary judgment.

### III. LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute on any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

3

The movant bears the initial burden to inform the Court of the basis for the motion and must identify portions of the record which demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-moving party must set forth specific facts showing a genuine issue for trial. *Id*. at 324.

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Claims that are not supported by admissible evidence are insufficient to establish a factual dispute, as is the mere existence of a scintilla of evidence in support of the non-movant's position. *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

The Court must view all submitted evidence, facts, and reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970). The district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994). The necessary inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

4

that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (internal quotes omitted).

## IV. ANALYSIS

The Court finds that Plaintiffs voluntarily waived their right to sue Inkster in federal court when they entered into stipulated WICA agreements. The Court also finds that WICA is not an unconstitutional exercise of the state of Michigan's power.

### A. Plaintiffs voluntarily waived their lawsuits against the City of Inkster by entering into WICA settlements.

WICA says that by accepting monetary judgments under the statute, Plaintiffs agree to release "all" claims against the state:

> The acceptance by the plaintiff of an award under this act, or of a compromise or settlement of the claim, must be in writing and, unless it is procured by fraud, is final and conclusive on the plaintiff, ***constitutes a complete release of all claims against this state***, and is a complete bar to any action in state court by the plaintiff against this state based on the same subject matter. However, the acceptance by the plaintiff of an award under this act, or of a compromise or settlement of the plaintiff's claim, does not operate as a waiver of, or bar to, any action in federal court against an individual alleged to have been involved in the investigation, prosecution, or conviction that gave rise to the wrongful conviction or imprisonment.

MCL 691.1755(8) (emphasis added). The parties do not dispute that Inkster is a state entity.

The leading case on the enforceability of release-dismissal

5

agreements is *Town of Newton v. Rumery*, 480 U.S. 386 (1987). There, the Supreme Court analyzed the enforceability of a release agreement that waived an individual's right to bring a civil rights suit against a state entity under 42 U.S. Code § 1983. *Id.* at 386. In that case, the plaintiff learned that a friend had been indicted for aggravated felonious sexual assault. *Id.* at 389. Plaintiff sought more information from a mutual acquaintance, who coincidentally was the victim of the assault. *Id.* The victim then called the town's chief of police to say that plaintiff tried to force her to drop the charges. *Id.*

Officers arrested and charged plaintiff with witness felony tampering. *Id.* at 390. His attorney and the prosecutor negotiated an agreement: the prosecutor would dismiss the charge against him if he agreed to release any civil claims he might have against the town, its officials, or the victim for any harm caused by his arrest. *Id.* Three days later, plaintiff signed a "release-dismissal agreement" and the state dropped criminal charges. *Id.* at 390.

Plaintiff filed a Section 1983 lawsuit, alleging that the town and its officers violated his constitutional rights by arresting him, defaming him, and falsely imprisoning him. *Id.* at 391. The trial court dismissed. *Id.* It agreed that the release-dismissal agreement was an affirmative defense to the suit. *Id.*

The court rejected plaintiff's argument that the agreement was unenforceable because it violated public policy; it concluded that a release of claims under Section 1983 was valid if it resulted from a decision that was voluntary, deliberate, and informed. *Id.*

The First Circuit reversed, adopting a *per se* rule invalidating release-dismissal agreements in the criminal context. *Id.* at 392. The court reasoned that "a covenant not to sue public officials for alleged deprivations of constitutional rights, executed in exchange for a decision not to prosecute criminal charges, is void *ab initio* as against public policy." *Rumery v. Town of Newton*, 778 F.2d 66, 67 (1st Cir. 1985), rev'd, 480 U.S. 386 (1987).

But the Supreme Court reversed, holding that release agreements are not *per se* unenforceable. *Rumery*, 480 U.S. 386 at 387. The Court reasoned that "criminal defendants are required to make difficult choices that effectively waive constitutional rights." *Id.* at 393 (internal citations omitted). "We see no reason to believe that release-dismissal agreements pose a more coercive choice than other situations we have accepted." *Id.* (internal citations omitted). The Court continued: "[i]n many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution

7

exceed the speculative benefits of prevailing in a civil action." *Id.* at 394.

Release agreements must still be scrutinized closely—especially in cases where evidence supports an allegation of police or prosecutorial misconduct. *See id.* at 394–95; *id.* at 400 (O'Connor, J., concurring in part and in the judgment). Since such scrutiny is required, *Rumery* "instructs us that before a court properly may conclude that a particular release-dismissal agreement is enforceable, it must specifically determine that (1) the agreement was voluntary; (2) there was no evidence of prosecutorial misconduct; and (3) enforcement of the agreement will not adversely affect relevant public interests." *Id.*

Although *Rumery* addresses releases in the context of criminal not civil proceedings, the Court's analysis applies here, and arguably with more force. If the Supreme Court found that a criminal defendant could waive constitutional rights (especially when criminal proceedings receive heightened scrutiny given that a defendant's freedom is on the line), it is likely the Court would find that a *civil* plaintiff can waive a remedy—which does not even rise to the level of a constitutional right—by entering into a release agreement, so long as the agreement is voluntary and intelligently made, and not in violation of public policy.

8

The Court finds that the three *Rumery* factors are satisfied.

1. <u>The WICA agreement was voluntary.</u>

The agreements Plaintiffs entered into were voluntary.

Competent counsel represented them (indeed, the same attorney who represents them now) when they agreed to abide by WICA's terms. Counsel is presumed to have known what WICA provides.

The Court finds that Plaintiffs made knowing and rational decisions to waive their Section 1983 rights against Inkster in favor of WICA judgments. They provide no evidence to the contrary.

2. <u>There is no evidence of misconduct in the agreement drafting process.</u>

Even though there was evidence of prosecutorial misconduct in the underlying criminal action, there is no evidence of state misconduct in the WICA negotiation process.

Unlike in *Rumery*, the state of Michigan did not dangle the carrot of freedom in exchange for releases of all civil liability—Plaintiffs were already free. Plaintiffs were not pleading guilty to criminal charges or waiving their right to counsel in a criminal case. The state court had no obligation to make sure their civil attorneys had adequately explained the ramifications of

9

accepting WICA agreements.

The Court finds there is no evidence of state misconduct in the settlement agreement negotiating process.

3. <u>Enforcement of the WICA agreement will not adversely affect competing public interests.</u>

Because there are conflicting interests at stake between the public policy behind encouraging Section 1983 claims in federal court and the public policy behind upholding contracts/release agreements voluntarily entered into, a discussion of these competing interests is in order.

> i. *Public policy behind allowing Section 1983 claims in federal court*

Section 1983 claims refer to lawsuits brought against state or local government officials or local and municipal governments for alleged violations of constitutional rights under color of law. *See* 42 U.S.C. § 1983. Allowing Section 1983 claims in federal court is essential; these claims are a vital tool to safeguard civil rights guaranteed by the United States Constitution. Allowing individuals to bring these claims in federal court reinforces the importance of protecting fundamental rights.

And, when government entities can be held liable for constitutional violations, it encourages them to implement policies and training that will

deter unlawful conduct by governments and their officials. Additionally, when a pattern of constitutional violations is identified within a government entity, court orders and settlements can produce changes in policies and practices to prevent future violations and protect individuals' rights. When government entities are sued for their actions, it allows for vital public scrutiny, and reinforces the principle that no one is above the law.

Section 1983 claims act as deterrents against abuses of power by governmental entity's officials—when individuals know they can be held personally liable for violating constitutional rights, they may be more likely to act in accordance with the law and respect citizens' rights.

Finally, Section 1983 claims allow individuals to seek remedies in federal court when state remedies may be insufficient or unavailable.

In sum, there are vital public interests in preserving the right of individuals to sue units of government in federal *Monell* actions.

### ii. *Public policy behind upholding contracts voluntarily entered into*

Upholding contracts voluntarily entered into is a fundamental principle in public policy and law for many reasons.

Voluntary contracts enable people to exercise personal autonomy by

11

allowing them to freely enter into agreements based on their own preferences and needs. The freedom to contract encourages individuals and businesses to negotiate terms which suit their own interests.

Upholding voluntary contracts also promotes trust in the legal system. When parties can trust that their agreements will be upheld by the law, they are more likely to contract with others. Enforcing voluntary contracts contributes to overall social order; it provides a reliable framework for settling disputes. This reduces the potential for conflict and ensures that individuals are held accountable for their promises.

A release agreement is a type of contract. Importantly, though public policy supports upholding releases, these agreements may be unenforceable for other public policy reasons. *See* Richard A. Lord, *Williston on Contracts* § 19:22 (4th ed.) (2023) (outlining the nature of unenforceable contracts and their effect on public policy).

Whether a particular release agreement is void as contrary to public policy depends on the facts and circumstances surrounding the making of the agreement; society's expectations; the identity and nature of the parties involved; and the terms of the agreement itself, including whether it was arrived at through fair negotiation or on terms dictated by the stronger party

on a take it or leave it basis. *Id.*

Agreements which courts consider to be against public policy include contracts that would cause injury to public services, contracts that obstruct or pervert justice, and contracts that promote litigation. *See id.* (outlining cases where courts have found a contract to be against public policy); *see also Restatement (Second) of Contracts* § 192 (1981).

### iii. Plaintiffs' WICA agreements are not contrary to public policy.

The Court finds that the public policy interest in upholding Plaintiffs' release agreements outweighs the public policy interest in allowing Plaintiffs to pursue Section 1983 claim in federal court after reaching settlements with the state for their wrongful convictions.

First, there are sensible reasons to uphold Plaintiffs' WICA agreements. Plaintiffs were not coerced and their rights were not violated. The criminal justice process was not circumvented. They entered knowing, intelligent, and voluntary waivers of their rights to bring Section 1983 claims against Inkster.

In exchange, they each received over $750,000 from the state. While Plaintiffs and many others may contend this is hardly justice for all of their

13

years of wrongful confinement, this was valid consideration in exchange for waiving their rights to sue Inkster in federal court.

Importantly, the state of Michigan waived its Eleventh Amendment immunity to enter these settlements. Otherwise, Plaintiffs would have never been able to collect from an otherwise unavailable deep pocket: the state of Michigan.

Public policy weighs in favor of enforcing the WICA agreements. Such treatment does not infringe on Plaintiffs' rights to bring Section 1983 suits in federal court for the following reasons.

### B. WICA does not violate the Supremacy Clause of the United States Constitution by barring plaintiffs from exercising their Section 1983 rights in federal court.

Where there is a conflict between federal law and state law, state law is deemed preempted. *Gade v. Nat'l Solid Waste Mgt Assoc.*, 505 U.S. 88, 108 (1992) (deriving preemption from the Supremacy Clause of the U.S. Constitution).

Assuming, *arguendo*, that Plaintiffs assert that release statutes are preempted by federal law and therefore invalid, the Sixth Circuit addressed this issue in *Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities*, 825 F.2d 946 (6th Cir. 1987).

14

In *Leaman*, a former probationary employee of the Ohio Department of Mental Retardation brought suit against the department and some of its officials for terminating her employment. *Id.* at 948. Her complaint alleged that the discharge violated Section 1983. *Id.* After suing the defendants in federal court, plaintiff elected to file a virtually identical complaint in the Ohio Court of Claims against the Department of Mental Retardation alone. *Id.*

The district court dismissed the federal action against department officials, applying this provision of the Ohio Court of Claims Act: "Except in the case of a civil action filed by the state, filing a civil action in the court of claims ***results in a complete waiver of any cause of action***, based on the same act or omission, which the filing party has against any state officer or employee." Ohio Revised Code § 2743.02(A)(1) (emphasis added). Plaintiff appealed, arguing that despite its language, the statute did not waive federal causes of action. *Leaman*, 825 F.2d at 951. She also argued that in any event, the statute was preempted by federal law because it conflicted with Section 1983. *Id.* The Sixth Circuit found neither argument persuasive.

1. <u>The Ohio law was clear in barring Plaintiff's suit in federal court.</u>

The *Leaman* court affirmed the district court's dismissal, reasoning that the word "any," as used in the statute, is "patently unambiguous" and is a

15

waiver to suit in federal court. *Id.* at 952 (internal quotes omitted); Ohio Revised Code § 2743.02(A)(1) ("Except in the case of a civil action filed by the state, filing a civil action in the court of claims results in a complete waiver of any cause of action, based on the same act or omission, which the filing party has against any state officer or employee."). "In providing that an election to sue the state in the Court of Claims results in a complete waiver of any cognate cause of action against individual state officers or employees, the Ohio legislature *clearly provided* for waiver of federal causes of action." *Leaman*, 825 F.2d at 952 (emphasis added). The court reasoned that such a statutory waiver of rights is valid, but only so long as the waiver does not conflict with federal law. *See id.* The court found that it did not.

### 2. The Ohio law was not preempted by federal law.

Leaman argued that the Ohio statute's language precluded her from suing in federal court under 42 U.S.C. § 1983, and because the Ohio law conflicted with federal law, it violated the Supremacy Clause and federal preemption law. *Id.* at 953.

Disagreeing, the *Leaman* court held,

> In no way does the Ohio statute shut the doors of the federal courts on claimants who are unwilling to forego suit there. It does not deprive claimants of their federal forum. The Ohio statute simply offers to make available an otherwise unavailable deep-pocket defendant, and an alternative forum, if prospective plaintiffs who think they have claims

16

> against individual state employees voluntarily elect to waive suit against the employees in favor of suit against the employer.

*Id.*

In other words, the court found that the Ohio statute did not infringe federal law and take away federal court jurisdiction to hear a Section 1983 claim. Rather, the statute merely gave individuals the discretion to choose whether they wanted to exercise their Section 1983 rights or not. *See id.* Indeed, this is exactly what individuals are free to do even absent the Ohio law: if people believe their constitutional rights were violated, they have the discretion to choose whether or not they will sue in federal court.

The Sixth Circuit goes on: "The law is clear that under the eleventh amendment, states are immune from § 1983 actions for damages or injunctive relief in federal court, and the Constitution does not require the State of Ohio to offer any waiver of its sovereign immunity." *Id.* (brackets and citations omitted). Ultimately, the Sixth Circuit held that the Supremacy Clause and federal preemption law were not invoked in *Leaman*.

Although Plaintiffs argue that the WICA release provision is ambiguous, *Leaman* supports that it is not, and that dismissal is warranted.

WICA's release language is very similar to the challenged language in

17

*Leaman*. *Compare* MCL 691.1755(8) ("The acceptance by the plaintiff of an award under this act . . . is final and conclusive on the plaintiff, **constitutes a complete release of all claims against this state**, and is a complete bar to any action in state court by the plaintiff against this state based on the same subject matter") *with* Ohio Revised Code § 2743.02(A)(1) ("Except in the case of a civil action filed by the state, filing a civil action in the court of claims **results in a complete waiver of any cause of action**, based on the same act or omission, which the filing party has against any state officer or employee.") (emphasis added in both).

Contrary to Plaintiffs assertion, WICA does not force any claimant to accept the government's statutory offer. The statute, "far from requiring that any claimant's constitutional rights be bartered away, afford[s] claimants an [alternative] mechanism for vindicating their rights. Constitutional rights may not be extinguished by any statute, state or federal, but this truism does not mean that suits or potential suits for alleged violations of such rights may not be compromised or waived." *Leaman*, 825 F.2d at 956. That is exactly what Plaintiffs did when they agreed to accept damages under WICA.

To be clear, no Michigan statute can take away a person's right to vindicate constitutional rights and seek remedies in a federal court. Perhaps that is why WICA does not specifically state that Plaintiffs cannot sue the

18

state or its entities in federal court; the state would have absolutely no authority to do that. Thus, the Court suggests that WICA's seemingly ambiguous provision may not be ambiguous at all, but intentionally omissive.

If Plaintiffs wanted to sue the state in federal court for damages, they had every right to do that in lieu of accepting WICA settlements. Instead, Plaintiffs chose to give up their Section 1983 rights in favor of monetary judgments.

The Court is satisfied that WICA does not infringe federal law or violate the Supremacy Clause.

## V. CONCLUSION

Because Plaintiffs waived their right to sue the City of Inkster in federal court when they accepted WICA settlements, their releases/waivers are a valid affirmative defense to their *Monell* claims. No genuine issue of material fact exists. Inkster is entitled to summary judgment.

It is unnecessary to address the failure to train arguments.

The Court **GRANTS** the City of Inkster's motion.

 **IT IS ORDERED**.

Dated: 7/28/2023

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge